### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
|    MONIQUE EVETTE JONES, | : | |
| | : | Bky. No. 10-15347ELF |
|       Debtor. | : | |
| _____ | : | |
| | : | |
| MONIQUE EVETTE JONES, | : | |
| | : | |
|      Plaintiff, | : | |
| | : | |
|   v. | : | |
| | : | |
| EDUCATION CREDIT MANAGEMENT | : | Adv. No. 10-0334 |
| CORPORATION, | : | |
| | : | |
| ACS EDUCATION SERVICES, INC., | : | |
| | : | |
|     Defendants. | : | |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, Plaintiff Monique Evette Jones ("the Debtor") seeks a discharge of her student loan obligations under 11 U.S.C. §523(a)(8).  Section 523(a)(8) provides that student loans are not dischargeable "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. §523(a)(8).

It is settled law in this Circuit that a debtor seeking to discharge his or her student loans must prove that:

> (1) based on current income and expenses, the debtor cannot maintain
> a "minimal" standard of living for himself or herself and his or her dependents
> if forced to repay the loans;

1

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and

(3) the debtor has made a good faith effort to repay the loans.

In re Faish, 72 F.3d 298, 304-05 (3d Cir. 1995) (quoting Brunner v. New York Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987)).  Courts in this circuit, as well as in other circuits that have adopted this legal standard, regularly refer to it as "the Brunner test."

As several courts have observed, §523(a)(8) imposes a "heightened standard for the discharge of student loans," one that imposes a "heavy burden" on the debtor.  See, e.g., In re Traversa, 2010 WL 1541443, at *10 n.19 (Bankr. D. Conn. Apr. 15, 2010) (citation omitted). After carefully reviewing the record, I find that the Debtor has met her burden of establishing undue hardship under 11 U.S.C. §523(a)(8).

## II.  PROCEDURAL HISTORY

The Debtor filed a petition under chapter 7 of the Bankruptcy Code on June 30, 2010.  On August 10, 2010, the Debtor initiated this adversary proceeding by filing a complaint seeking the discharge of her education loan obligation.  (Doc. #1).  On September 8, 2010, Defendant Educational Credit Management Corporation ("ECMC") filed an answer to the complaint.[1]

---

[1]    The Debtor initially named American Education Services ("AES") and James Preston, CEO as the defendants in her complaint.  Subsequently, by agreement, ECMC was substituted in as defendant in lieu of AES and Preston.

ECMC is a Minnesota nonprofit corporation, acting as a designated guaranty agency pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. §§1077 et. seq.  ECMC was designated as a guaranty agency by the United States Secretary of Education on April 1, 1994 as the Transitional Guaranty Agency.  ECMC provides specialized guaranty agency services to the Department

(continued...)

(Doc. # 3).

On February 13, 2011, the Debtor filed a Motion to Amend Complaint in order to include the second student loan in the instant action, since both matters presented the same substantive issues. (Doc. #19). With the consent of all parties, the court granted the Debtor's Motion to Amend on March 16, 2011. (Doc. #23). On March 22, 2011, The Debtor filed an Amended Complaint naming ACS Education Services ("ACS") as a co-defendant. ECMC filed an Answer to the Amended Complaint on March 28, 2011 and ACS filed its Answer on April 12, 2011.[2] (Doc. #'s 29, 31).

Trial of this proceeding was held and concluded on November 1, 2011. At the conclusion of the trial, the parties were offered the opportunity to file post-trial memoranda in support of their respective positions, but all parties declined to do so. On March 4, 2013, after concluding that the record was inadequate with respect to the payment terms of the subject student loans, I directed the parties to supplement the record. (See Doc. # 42). On March 28 and 29, 2013, the Debtor filed joint stipulations with each defendant in accordance with my order. (See Doc. #'s 44

---

[1](...continued)
of Education, and also accepts bankrupt student loan accounts from other guaranty agencies. (ECMC's Amended Ans. at 1).

[2]    ACS appeared through StabFund (USA) Student Loan Trust ("StabFund'). StabFund, a New York Common Law Trust, is the holder of the second student loan at issue here. ACS, the second named defendant, is the loan servicer. (StabFund's Answer at ¶4). While it probably would have been more appropriate to add StabFund, rather than ACS as the named defendant, given StabFund's participation and the outcome of the adversary proceeding, as a practical matter, the distinction may be inconsequential.

& 45).[3]

# III.  FINDINGS OF FACT

Based on the evidence presented at trial, I make the following findings of fact, as of the

date of trial, November 1, 2011.

## A.  The Debtor's Family and Background

1.  The Debtor is a 45 year old single woman with no serious medical problems.

2.  The Debtor has two (2) daughters, Khaliah S. Moody and Kierah Fowler.  (Joint Pre-Trial

    Stmt. ¶1).

3.  Khaliah, is twenty-three (23) years old and does not live with the Debtor.

---

[3]      Attached to the stipulation filed by the Debtor and ECMC was the Affidavit of Lisa A.
Thigpen, Supervisor of Legal Operations of ECMC ("the Thigpen Affidavit").  The Thigpen Affidavit
provides a general history of the loan transaction.  In addition, it states that the Debtor would be eligible
for a loan consolidation through the William D. Ford Federal Direct Loan Program.  See 34 C.F.R. §685.
Specifically, the Debtor could qualify for the Income Contingent Repayment Plan ("ICRP"), 34 C.F.R.
§685.209, whereby the Debtor's monthly payment would be calculated on the basis of her adjusted gross
income.  Under the ICRP, the Debtor's monthly payment could be zero.  (See Doc. #45).

        Ms. Thigpen's commentary on the ICRP is the first reference in the record to the ICRP
program.  This is, frankly, surprising.  The ICRP often is a hot-button issue in student loan
dischargeability litigation, particularly with respect to the third prong of the Brunner test.  See, e.g., In re
Barrett, 487 F.3d 353 (6th Cir. 2007); In re Nielsen, 473 B.R. 755 (B.A.P. 8th Cir. 2012); In re Flickinger-
Luther, 462 B.R. 157 (Bankr. W.D. Pa. 2012); In re Najafian, 2012 WL 4793117 (Bankr. E.D. Va. Oct. 9,
2012); In re Crawley, 460 B.R. 421 (Bankr. E.D. Pa. 2011).  However, at no time during the trial or
closing argument did ECMC bring up the ICRP in relation to the Brunner test.  Indeed, neither party
developed the record on the issue  – e.g., whether the Debtor was given notice of the program; if so,
when was such notice was given and why she did not seek to participate.  Consequently, in light of the
belated reference to the ICRP in a post-trial, fact stipulation and the absence of an accompanying factual
record or focused legal argument, I deem ECMC to have waived any defense arguments based on the
ICRP.

4.   Kierah is sixteen (16) years old and lives with the Debtor.  (Hr'g at 9:24).[4]

5.   Kierah was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") when she

was approximately 8 years old.[5]  (Id.).

6.   Although Kierah's condition is severe enough that she has qualified for SSI disability

benefits, the record is equivocal regarding the ongoing severity and prospects of

improvement in her condition.[6]

---

[4]      All references herein are to the time of the recorded testimony at the trial on November 1, 2011.

[5]      The Debtor provided a different time line in her response to  ECMC's Interrogatories. (Ex. ECMC-1, Ans. to Interrog. No. 12).  There, she stated that Kierah was diagnosed with ADHD over ten (10) years ago and has been receiving benefits under the Supplemental Security Income program ("SSI") since she was three (3) years old.  She stated that Kierah was diagnosed "by the SSI doctor," but the Debtor did not know the doctor's whereabouts or his name.  The Debtor also did not have a copy of the letter diagnosing her daughter.  (Ex. ECMC-1).

[6]      The Debtor's testimony was the only evidence presented regarding the severity of Kierah's medical condition.  That testimony was inconsistent.  The Debtor testified that Kierah's condition requires nearly constant supervision.  The Debtor stated that she would not leave her daughter alone, even at the age of 16, because she believed her daughter would be a risk to herself or the home. She also explained that she made a concerted decision to take her daughter off the medication prescribed because of the side effects (in that "it was keeping her up at night;" made her a "zombie").  (Hr'g at 10:08).  The Debtor was adamant that her daughter have "no more medication!" (Id.).  However, at the same time as she depicted her daughter as needing constant supervision, the Debtor also testified that she believes that Kierah will leave home at some point in the near future, after she turns 18 years of age.

     Thus, on the one hand, in attempting to justify what she considers her inability to work full-time, the Debtor described her daughter as presently being entirely dependent.  Yet, the Debtor also believed her daughter would move out of her home in the relatively near future, possibly as early as her 18th birthday.  Perhaps medical testimony could have harmonized or clarified the tension in the Debtor's testimony, but none was presented.

**B. The Debtor's Education and Work History**

7.   The Debtor attended South Philadelphia High School until the eleventh grade.  She never

graduated or received a high school diploma.  (Joint Pre-Trial Stmt. ¶13).

8.   Since 2002, the Debtor has been employed by the Philadelphia School District ("PSD") as a

part-time lunchroom aid.  (Id. ¶15).

9.   The Debtor works only part-time so that she can care for Kierah.  She works five (5) hours

per day from 8:00 am until 1:00 pm with an unpaid break for lunch during the school year

months of September through June.  (Ex. P-7; Hr'g at 9:24; 9:32).

10.   Prior to her employment with PSD, the Debtor was unemployed.  (Ex. ECMC-1)

11.   The Debtor is working toward obtaining a High School Equivalency Diploma through a

General Educational Development program ("GED").  (Hr'g at 9:37).

12.   At the time of trial, she was enrolled in two (2) courses: English III and Algebra II.  (Ex. P-

8).  Each course is one (1) credit and upon completion of her current enrollment, she will

have eight (8) credits toward her GED.  It is possible it will take her at least (4) years to

attain the requisite twenty (23) credits to receive her GED.  (Hr'g. at 9:37, 10:32).

13.   The Debtor attends her GED courses in the evening.  She brings Kierah with her because

Kierah cannot be home alone.  While the Debtor attends class, Kierah waits in another

classroom where she is supervised and typically watches television.  (Hr'g at 10:16).

### C.  The Student Loans

#### 1.  The First Loan

14.  On August 21, 2006, the Debtor co-signed a student loan with her daughter Khaliah at

Citizen's Bank ("the First Loan").  (Hr'g at 10:37).

15.  At the time, Khaliah was attending Widener University.  (Hr'g at 10:40).[7]

16.  The Debtor believed that the First Loan would enable Khaliah to obtain a "better life"

because it would assist her in paying for a college education.  (Id.).

17.  The original principal balance was $14,586.52.  (See Stip. ¶2, Doc. # 44).

18.  Under the repayment terms of the First Loan, the Debtor has a monthly payment of $216.22

with an interest rate of .05060 % on the unpaid balance.  (Id. ¶¶4-5).

19.  The Debtor did not know she would be legally obligated to repay the First Loan when she

co-signed it with her daughter.  Rather, the Debtor believed that Khaliah bore the repayment

obligation and those payments would not be due until six (6) months after Khaliah finished

school.  (Hr'g at 9:55-56; 10:40).

#### 2. The Plus Loan

20.  On September 7, 2007, the Debtor signed a "Federal Plus Loan Application and Master

---

[7]        Khaliah left Widener University prior to finishing her course work.  The Debtor did not
explain the reason for Khaliah's premature departure, but testified that she was in regular contact with
Khaliah and believed she was working.  The Debtor reported that Khaliah was intending to go back to
school and already had been accepted to Temple University and wanted to study criminal justice.  The
Debtor also stated that she had discussed the loans with her daughter and that she thinks Khaliah wants to
pay them back.  However, the Debtor has never asked Khaliah for help.  (Hr'g at 9:47).

Promissory Note" for a second student loan for Khaliah ("the Plus Loan").[8]  (Ex. ECMC-2).

21.   The Pennsylvania Higher Education Assistance Agency ("PHEAA") guaranteed the Plus

Loan.  (Stip. ¶4, Doc. # 45).

22.   The Debtor testified that she does not recall signing the Plus Loan, even though she is the

sole signatory under "Parent Borrower."  (Hr'g at 9:49).

23.   On or about January 10, 2008, the Plus Loan was disbursed in the amount of $12,000.00 for

Khaliah's attendance at Widener University.  (Stip. ¶4, Doc. # 45).

24.   When the Debtor defaulted on the Plus Loan, a claim was filed with PHEAA by the

operation of the Note's guarantee.  (Id. ¶5).

25.   On or about October 16, 2009, PHEAA paid the default claim and all unpaid interest was

capitalized and the Plus Loan became subject to collection costs as required by 34 C.F.R.

§682.410(b)(2) & (4).  (Id. ¶7).

26.   On May 21, 2010 and June 4, 2010, PHEAA garnished $53.29 from the Debtor's paycheck.

In other words, the Debtor made payments on the Plus Loan through administrative wage

garnishment in the total amount of $106.58.  (Ex. P-3; Stip. ¶8, Doc. # 45).

27.   The garnishment "set back" the Debtor and was the reason she filed the bankruptcy case.

(Hr'g at 9:34).

28.   As of March 24, 2013, the balance on the Note for the Plus Loan is $21,781.44, which

consists of principal, interest, and collection costs.  Interest accrues at the fixed rate of 8.5%

---

[8]      A Federal Plus Loan is one made under the Federal Plus Program, which was designed to
encourage loans to parents of dependent undergraduate students.  See 34 C.F.R. §668.2

per annum.  (Stip. ¶11, Doc. # 45).[9]

29. ECMC is the current holder of the Note on the Plus Loan.  (Stip. ¶10, Doc. # 45).[10]

### D. The Debtor's Financial Situation

30. The Debtor's sole means of support for herself and Kierah are:

   a. the Debtor's monthly pay from PSD of approximately $736.81, (see Exs. P-1, Sch. I; P-5); and

   b. $674.00 per month in Social Security Income ("SSI") benefits that she receives on account of Kierah's disability, (see Ex. P-6).

31. The Debtor does not earn any income from PSD during the two (2) summer months each year.  During those months of unemployment, she pays her rent with the SSI check she receives on behalf of Kierah.  (Hr'g. at 9:59).

32. The Debtor has received tax refunds ranging from $2,300.00 to $5,100.00 in the years 2007-2009.  (See Ex. ECMC-4).  She has used these refunds for household expenses.

---

[9]     The joint stipulation filed by the Debtor and ECMC did not entirely comply with the terms of my March 4, 2013 order because I was unable to ascertain the precise term and monthly payment of the Plus Loan.  (See Doc. # 45).  Therefore, I will estimate the monthly payment of the loan by running a calculation with the terms provided by Ms. Thigpen in accordance with the relevant regulations.  See 34 C.F.R. §682.209.  Given that the parties agree that the balance on the Note for the Plus Loan is $21,781.44 with a fixed rate of interest accruing at 8.5% per annum, the Debtor would have a monthly payment of nearly $200 per month.  I come to this conclusion on the basis of calculating the monthly payment under the most generous pay out term (25 years) under which the Debtor would be obligated to pay $175.39 per month.  Under the most aggressive payment term of ten (10) years, she would have a monthly payment of $270.06 per month.

[10]     PHEAA assigned all right, title and interest in the Plus Loan to ECMC on or about August 18, 2010.  (Stip. ¶9, Doc. #45).

33. For purposes of evaluating whether the Debtor can maintain a minimal standard of living, the Debtor's monthly income derived from PSD is $921.66.[11]

34. For purposes of evaluating whether the Debtor can maintain a minimal standard of living, the Debtor's total monthly income derived from PSD and Kierah's SSI check is $1,595.66.[12]

35. The Debtor will continue to receive the SSI check until Kierah reaches the age of 18, after which the check will be sent directly to Kierah.  (Hr'g at 9:35).

36. The Debtor owns a 1998 Toyota Avalon, worth approximately $2,200.00, although the Debtor testified that the vehicle is inoperable.[13]

37. The Debtor has no other assets except household furnishings, clothing and jewelry, valued at approximately $1,100.00.  (See Ex. P-1, Sch. B).

38. The Debtor has no bank accounts, savings or disposable income.  She also has never been on an airplane or taken a vacation.  (Hr'g at 9:30).

---

[11]      The evidence presented was that the Debtor's net monthly income from PSD is approximately $736.00.  However, this monthly amount is understated in one (1) respect and overstated in one (1) respect.  It is overstated because the Debtor is paid in only ten (10) of twelve (12) months each year by PSD.  It is understated in that it fails to account for the additional income in the form of federal income tax refunds the Debtor receives each year, which are derived from various federal tax credits.

After accounting for the two (2) months in which she receives no paychecks, the Debtor's monthly PSD income effectively drops from $736.00 to **$613.33**.  ($736.00 x 10 months, divided by 12 equals $613.33).  As for the tax refund, I will adjust my calculation of the Debtor's earned income by adding to her net pay the average of the range of her tax refunds in past years.  This results in an additional **$308.33** in monthly income.  ($2,300.00 + $5,100.00 divided by 2 equals $3,700.00).  Based on these adjusted figures, the Debtor's monthly income derived from her employment at PSD is **$921.66**.  ($613.33  +  $308.33 equals $921.66).

[12]      $921.66 earned income + $674.00 SSI benefit equals $1,595.66.

[13]      The Debtor testified that the car's "engine blew" and went out of service about 1 ½ years prior to the trial.  She cannot afford another car.

39.  The Debtor's total indebtedness for both student loans is approximately $29,760.00.

40.  The combined monthly payment on the two (2) loans is at least $400.00 per month.[14]

41.  The Debtor was unaware she had any repayment obligation on the Plus Loan prior to the

garnishment.[15]

# IV.  DISCUSSION

## A.  Dischargeability Standard  – 11 U.S.C. § 523(a)(8)

### 1.

The discharge of student loans in a chapter 7 case is governed by 11 U.S.C. §523(a)(8),

which provides:

> (a)      A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt --
>
> (8) <u>unless excepting such debt from discharge under this
> paragraph would impose an undue hardship on the debtor and
> the debtor's dependents</u>, for –
>
> (A)(I) an educational benefit overpayment or loan made,
> insured, or guaranteed by a governmental unit, or made

---

[14]      The monthly payment on the First Loan is $216.22.  <u>See</u> Finding of Fact No. 18.  As for the Plus Loan, the Thigpen Affidavit did not respond to my request that the parties' supplement the record by setting forth "the original loan term and the monthly payment" of the loan.  (<u>See</u> Order dated March 4, 2013, Doc. # 42).  However, it did advise that the balance is $21,781.44 with interest accruing at 8.5%.  <u>See</u> Finding of Fact No. 28.  Even assuming (generously in ECMC's favor) that the loan term runs another twenty (20) years, the monthly payment on the loan would be in excess of $189.00.  Of course, the monthly payment would be even higher if the loan term were shorter.

[15]      The Debtor testified that she never received any statements or notice prior to the garnishment. Moreover, she assumed the garnishment was for the First Loan because she had no recollection of signing the Plus loan.  (Hr'g at 9:34).

11

> under any program funded in whole or part by a
> governmental unit or nonprofit institution; or
>
>> (ii) an obligation to repay funds received as an educational
>> benefit, scholarship, or stipend; or
>
> (B) any other education loan that is a qualified education loan, as
> defined in section 221(d)(1) of the Internal Revenue Code of 1986,
> incurred by a debtor who is an individual . . . .

11 U.S.C. §523(a)(8) (emphasis added).

A debtor seeking to discharge student loan debt falling within the purview of §523(a)(8) assumes the burden of establishing that excepting that debt from discharge will cause the debtor and his or her dependents "undue hardship."  See Faish, 72 F.3d at 304-05; In re Zierden-Landmesser, 249 B.R. 65, 69-70 (M.D. Pa. 2000).

In deciding adversary proceedings brought under §523(a)(8), courts have focused on the purposes that motivated Congress to treat the discharge of student loan obligations differently than other debts.  One court reasoned:

> In enacting the undue hardship standard, Congress had to take into account
> the viability of the student loan program.  That program serves valuable
> purposes.  It affords individuals in all walks of life the opportunity to obtain
> an education, and with it the mobility and financial stability that an education
> can provide.  Indeed, without the program, many people would never receive
> any higher education, because their credit risks would preclude them from
> obtaining private commercial loans.

In re Frushour, 433 F.3d 393, 399 (4th Cir. 2005) (citation omitted); see also In re Brunner, 46 B.R. 752, 756 (S.D.N.Y. 1985) ("In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances."), aff'd, 831 F.2d 395 (2d Cir. 1987).

Congress intended §523(a)(8)'s heightened standard for obtaining a student loan

discharge to help ensure the financial integrity of the student loan program by protecting it from

fiscal doom.  Frushour, 433 F.3d at 400.  Section 523(a)(8) is also said to help ensure "public

support for the [student loan] program by preventing debtors from easily discharging their debts

at the expense of the taxpayers who made possible their educations."  Id.; see also Faish, 72 F.3d

at 306 (noting that the "undue hardship" standard "safeguards the financial integrity of the

student loan program by not permitting debtors who have obtained the substantial benefits of an

education funded by taxpayer dollars to dismiss their obligation simply because repayment of the

borrowed funds would require some major personal and financial sacrifices").

In short, Congress enacted §523(a)(8) to foster "the twin goals of rescuing the student

loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving

debtors."  In re Pelkowksi, 990 F.2d 737, 743 (3d Cir. 1993).


## 2.

As stated earlier, the Third Circuit in Faish adopted the three-part test for evaluating

whether "undue hardship" exists set forth by the Second Circuit in Brunner: (1) present inability

to repay the loan while maintaining a minimal standard of living; (2) additional circumstances

suggesting that the present inability to pay will continue for a significant period of the loan's

repayment period; and (3) a past, good faith effort to repay the loan.

The debtor bears the burden of establishing each element of the Brunner test by a

preponderance of the evidence.  In re Brightful, 267 F.3d 324, 327 (3d Cir. 2001).  All three (3)

elements must be satisfied individually before a discharge can be granted.  If any one of the

Brunner requirements is not satisfied, the bankruptcy court's inquiry must end there, with a

finding of no dischargeability.  <u>Faish</u>, 72 F.3d at 306.

The Court of Appeals has instructed that this test provides "the definitive, exclusive authority that bankruptcy courts must utilize to determine whether the 'undue hardship' exception applies."  <u>Id.</u>  "Equitable concerns or other extraneous factors not contemplated by the <u>Brunner</u> framework may not be imported into the court's analysis to support a finding of dischargeability."  <u>Id.</u>


**B.  Prong #1 of the <u>Brunner</u> Test**

**1.**

The first prong of the <u>Brunner</u> test requires a debtor to show that at the debtor's current level of income and expenses, the debtor cannot maintain a minimal standard of living if forced to repay his student loans.  <u>Faish</u>, 72 F.3d at 304-05.  The "minimal standard of living"

> is not a fixed measure, and the concept is not defined by bright lines.  The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment."  While it does not relegate a debtor to the depths of "abject poverty, a minimal standard of living does not accommodate 'luxury type expenses.'"  After providing for his or her basic needs, a debtor may not use her . . .  financial resources for discretionary expenditures in lieu of repaying student loan creditors.

<u>In re Miller</u>, 409 B.R. 299, 311 (Bankr. E.D. Pa. 2009) (quoting <u>In re Johnson</u>, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009) (internal citations omitted)).  "It is well established that maintaining a minimal standard of living does not mean that [a][d]ebtor has to live at a poverty level to repay [a] student loan."  <u>In re Alston</u>, 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003).  "Given the absence of 'bright lines,' perhaps the best that can be said is that 'a minimal standard of living lies

somewhere between poverty and mere difficulty.'"  Miller, 409 B.R. at 311 (quoting In re

McLaney, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004), aff'd as modified, 375 B.R. 666 (M.D.

Ala. 2007)).

I adhere to the view, expressed in Miller, that the list of basic needs set forth in In re

Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001), is helpful in assessing the contours of a minimal

standard of living.  See Miller, 409 B.R. at 311-312.  Those elements of a "minimal standard of

living" identified in Ivory are:

> (1) shelter that is furnished, clean, free of pests and climate-regulated with heating
>     and cooling;
>
> (2) basic utilities such as electricity, water, gas and telephone;
>
> (3) food and personal hygiene products;
>
> (4) transportation or vehicles (and the ability to service and insure those vehicles);
>
> (5) life insurance and health insurance (or the ability to pay for medical and dental
>     expenses);
>
> (6) modest recreation.

269 B.R. at 899.

Thus, in evaluating whether the Debtor has satisfied the first prong of the Brunner test, I

first consider the expected cost of providing for the basic needs for the Debtor and her daughter

and then evaluate whether the Debtor has any additional funds available to make the necessary

payments toward her student loan.  In re Jones, 392 B.R. 116, 127 (Bankr. E.D. Pa. 2008); see

also In re Burton, 339 B.R. 856, 870-71 (Bankr. E.D. Va. 2006) (once the court determines the

amount minimally necessary to ensure that the debtor's needs for food, shelter, clothing and

medical treatment are met, "the question is whether the debtor has additional funds with which to

make payments toward . . . [the] student loans").

### 2.

I have found that the Debtor's monthly income is approximately $1,595.66. (Findings of Fact Nos. 29-33). Based on an income of just under $1,600.00 per month for a family of two (2), the Debtor is hovering slightly above the official poverty level set by the Federal Department of Health and Human Services. See 76 Fed. Reg. 3637-38 (Jan. 31, 2011). Taking into account that an income level that only slightly exceeds the official poverty level likely does not permit an individual to maintain a minimal standard of living, see In re Rutherford, 317 B.R. 865, 878-79 (Bankr. N.D. Ala. 2004), and after examining the Debtor's monthly expenditures, I am satisfied that she cannot maintain a minimal standard of living if required to make any repayment of her student loans.

According to the Debtor's bankruptcy Schedule J, her average monthly expenses total $1,334.00, as follows:

|  |  |
|---|---|
| rent and utilities | $ 418.00 |
| food | 400.00 |
| cable | 114.00 |
| telephone (land line) | 179.00 |
| transportation | 85.00 |
| auto insurance | 88.00 |
| clothing | 10.00 |
| laundry/dry cleaning | 10.00 |
| medical expenses | 0.00 |
| school supplies (daughter) | 20.00 |
| recreation | 10.00 |
| **Total** | **$1,334.00** |

A few observations regarding this expense itemization are appropriate.

16

Several of the Debtor's itemized expenses are modest allocations, such as her monthly housing and utility expense of $418.00.  Undoubtedly, the Debtor can provide shelter, electric and heat for herself and her daughter for $418.00 per month only because, as a public housing tenant, these expenses are subsidized by the government.  See generally Wright v. City of Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 420 & nn.2-3 (1987) (discussing the "Brooke Amendment").  Similarly, the Debtor's expenditure of $400.00 per month for food (supplemented by her receipt of food stamps in the summer, when she has no earned income), $85.00 per month for transportation, $20.00 per month for her daughter's school supplies are modest, at best, and perhaps even understated.

Several expenses more definitely appear to be understated.  For example, the Debtor budgets only $10.00 per month for clothing and laundry/dry cleaning, as well as only $10.00 per month for recreation.  I also observe that the Debtor allocates $0.00 for medical expenses. Although the record was not developed on this point, the Debtor presumably has no such expenses because she is eligible for medical assistance as a result of Khaliah's disability and her own low income level.  Undoubtedly, her eligibility for medical assistance minimizes her ongoing medical expenses, but the Pennsylvania Department of Public Welfare's website suggests that there are some medical expenses (co-pays) for which a medical assistance recipient is responsible.  See http://www.dpw.state.pa.us/foradults/healthcaremedicalassistance/copaymentinformationformedi calassistancerecipients/index.htm.

The Defendants question the Debtor's monthly expense of $293.00 for cable and phone.[16] I recognize that there was a time when expenses for cable and phone were deemed luxuries, but that is no longer true. See, e.g., Frushour, 433 F.3d at 400 (stating in dicta that cable and internet expenses alone would not disqualify the debtor from an undue hardship discharge); In re Douglas, 366 B.R. 241, 255-56 (Bankr. M.D. Ga. 2007) (finding that a $48.00 a month expenditure on cable television and internet is not inconsistent with the minimal standard of living); McLaney, 314 B.R. at 234 ($65.00 a month expenditure on cable television was reasonable). But see In re Russotto, 370 B.R. 853 (Bankr. S.D. Fla. 2007) (finding Debtor's $130.00 a month for upgraded cable an unreasonable expense under Brunner). I believe that expenses for a phone and basic cable as a modest form of recreation falls within the minimum standard of living in today's day and age.

There are two items in the Debtor's expense budget that appear somewhat anomalous. First, the land-line expense of $179.00 seems high, unless it also includes internet access. The record was not developed on this point. Second, the Debtor also allocates $88.00 per month for car insurance. This is odd in light of her testimony that her car was inoperable for more than a year prior to the trial.

Despite a couple of "loose ends" in the Debtor's presentation, I am persuaded that, in her present circumstances, the Debtor could not maintain a minimal standard of living if required to

---

[16]    The Debtor explained that she has two (2) televisions and two (2) cable boxes, but only pays for basis cable. She does not have premium channels. As for her phone bill, she explained that she lets the balance carry over because she is not paying the full amount each month. It was unclear whether the bill was actually $179 per month or if it was inflated due to a remaining balance. A copy of her phone bill was not admitted into evidence. (Hr'g at 10:09).

repay $400.00 (or more) per month in repayment of her student loan debt.  As I observed in an

earlier decision,

> Generally, an evaluation of income and expenses as presented in a debtor's
> bankruptcy schedules is instrumental in the analysis as to whether the Debtor can
> maintain a minimal standard of living.  However, it is not imperative for the court
> to wade through a debtor's budget dollar-for-dollar to find all possible ways to
> create a surplus if the expense level and living standard remains minimal.

Crawley, 460 B.R. at 436 n.15 (citations omitted); accord In re Zook, 2009 WL 512436, at *9

(Bankr. D.D.C. Feb. 27, 2009); Alan N. Resnick & Henry J. Sommer, eds., 4 Collier on

Bankruptcy ¶ 523.14[2], at 523–105-06 (16th ed. 2013) (hereinafter, "Collier on Bankruptcy")

(citing In re Cline, 248 B.R. 347 (B.A.P. 8th Cir. 2000))

In this case, the Debtor has no excessive or luxury expenses and the one (1) or two (2)

expenses that one might question further are offset by her likely under-budgeting for other basic

expenses.  See McLaney, 375 B.R. at 675 ("as a court examines a debtor's expense budget as a

whole, it is appropriate for a court to take into account reasonably necessary items that are

omitted").  The fact remains that the Debtor is just making ends meet.  After paying for basic life

expenses, the Debtor has very little, if anything, left.  She has no savings, no life insurance, no

medical insurance (other than that provided to her by the government) and has never taken a

vacation.  Therefore, I conclude that the Debtor has met her burden on the first Brunner prong –

that with the payment of the student loans she is not able to maintain a minimum standard of

living.

## C.  Prong #2 of the Brunner Test

### 1.

Under the second prong of the Brunner test, the Debtor must demonstrate that "additional circumstances exist indicating that [the debtor's present state of economic distress] is likely to persist for a significant portion of the repayment period for [the] student loans,"[17] and that this inability to pay is attributable to reasons outside the debtor's control.[18]

The second prong actually is comprised of two (2) elements.  See 4 Collier on Bankruptcy ¶ 523.14[2] at 523 –106.  The first is whether the debtor's financial difficulties are "likely" to continue.  Id.  Under this element, a debtor is only required to establish that her financial situation is not likely to improve.  Id.  The second element is "temporal" and requires the debtor to prove that the duration of her financial hardship will be for a significant period of the repayment period.  Id. at 523–106-07.

To satisfy the second prong, the Debtor must present "definitive evidence that the Debtor's earning potential will not improve in the future."  In re Fabrizio, 369 B.R. 238, 248 (Bankr. W.D. Pa. 2007).  The types of circumstances that satisfy the second prong include "long-term physical or mental problems precluding employment, lack of marketable job skills, or the necessity of fully supporting several dependents which precludes sufficient income."  In re Sperazza, 366 B.R. 397, 411 (Bankr. E.D. Pa. 2007).[19]

---

[17]      Faish, 72 F.3d at 305 (quoting Brunner, 831 F.2d at 396).

[18]      Brightful, 267 F.3d at 328.

[19]      One court has collected twelve (12) factors that a court might consider:

(continued...)

The second prong puts the bankruptcy court in the "unenviable position of trying to predict what a debtor's circumstances will be for decades." In re Greenwood, 349 B.R. 795, 803 (Bankr. D. Ariz. 2006); see also In re Berry, 266 B.R. 359, 364 (Bankr. N.D. Ohio 2000) (referring to the second prong analysis as "speculative" in nature because it calls upon the court "to predict future events"); In re Young, 225 B.R. 312, 318 (Bankr. E.D. Pa. 1998) (observing that the debtor's future income potential was "difficult to predict"); In re Goranson, 183 B.R. 52,

---

[19](...continued)

(1) serious mental or physical disability of the debtor or the debtor's dependents, which prevents employment or advancement;

(2) the debtor's obligations to care for dependents;

(3) lack of, or severely limited education;

(4) poor quality of education;

(5) lack of usable or marketable job skills;

(6) underemployment;

(7) maximized income potential in the chosen educational field, and no other more lucrative job skills;

(8) limited number of years remaining in work life to allow payment of the loan;

(9) age or other factors that prevent retraining or relocation as a means for payment of the loan;

(10) lack of assets, whether or not exempt, which could be used to pay the loan;

(11) potentially increasing expenses that outweigh any potential appreciation on the value of the debtor's assets and/or likely increases in the debtor's income; and

(12) lack of better financial options elsewhere

In re Nys, 308 B.R. 436, 446–47 (B.A.P. 9th Cir. 2004) (citations omitted).  Several of these factors are obviously applicable to the Debtor.

21

55-56 (Bankr. W.D.N.Y. 1995) (referring to the "difficulty" of linking of undue hardship with the need "to predict the future").

## 2.

In this case, I find that the Debtor has met her burden under the second prong because she has put forward sufficient evidence that her earning potential will not improve in the future.

The Debtor's situation is compelling.  She is a single mother caring for a daughter with special needs.  Her limited education forecloses her from a wide variety of employment opportunities and invariably limits her earning potential.  Her daughter's childcare demands restrict the number of hours she can work, thus further inhibiting her ability to bring more income into the household. The Debtor derives nearly half of her household monthly income from the SSI her daughter receives and, as explained earlier, there is no question that the Debtor needs this income to manage her household.  Moreover, in another year or so, when Kierah turns 18 years old, the check will be sent directly to Kierah and the Debtor will no longer have the guarantee of receiving that regular stream of income, particularly if Kierah decides to leave the home.

There is, however, evidence in the record suggesting that the Debtor is working toward improving her earning potential.  The Debtor is enrolled in a GED program with approximately four (4) years remaining until she earns a diploma.  She seems motivated, is generally healthy and relatively young with likely twenty (20) years available in the future for gainful employment.

Nonetheless, there are several distinct wild cards in the analysis of the Debtor's prospects. Will the Debtor continue to care for Kierah indefinitely with the ongoing impediment that it

places on her income earning ability?  Or will Kierah improve sufficiently so that she may live

independently after her 18th birthday, thereby decreasing the Debtor's present income but,

perhaps, increasing her ability to generate income – particularly if she obtains her GED?

The evidence regarding the length and extent of Kierah's dependency on her mother is

inconclusive.  See n.6, supra.  I suspect and appreciate that the Debtor harbors great hesitation

and some anxiety about Kierah leaving her household, simply out of concern for her daughter's

well being.

That said, the Debtor was unequivocal in her belief that Kierah will move out, eventually.

She seemed cautiously confident that Kierah ultimately will live an independent and productive

life as an adult in the reasonably near future.  To her credit, it appears that the Debtor is doing

everything she can to help her daughter attain this goal.  For instance, Kierah had recently been

"mainstreamed" at school, moving from her special needs classes to a room with "regular"

children.  Though the Debtor felt that Kierah was "struggling" with it, she expressed her desire to

encourage her daughter and not treat her as disabled.  (Hr'g at 10:25-10:28).  I presume the

Debtor will continue helping Kierah move forward with her life.

Based on the evidence, I perceive two (2) potential future scenarios for the Debtor and her

daughter.

In one scenario, the Debtor's testimony regarding Kierah's ability to overcome her

limitations and live independently proves to be overly optimistic and Kierah remains indefinitely

in the Debtor's care, requiring a level of supervision that limits the Debtor's ability to work full-

time as well as the prospects for improving her financial position.

In a second scenario, Kierah moves out (or her condition improves) such that the Debtor

can progress toward full-time work.  Under these circumstances, however, the Debtor believes

that her potentially increased income would do no more than replace the loss of Kierah's SSI

income.  (Hr'g at 9:37).  Her concern on this point is understandable.  While she certainly may be

free to work more hours under the more optimistic scenario in which Kierah is able to live

independently, I fail to see how her ability to do so will replace the income Kierah takes with her

($674.00 per month) as well as permit her to pay an additional $400.00 per month (or more) in

repayment of the student loans.

　　　　While there is some evidence presented suggesting that the Debtor's financial situation

could improve, I find it more likely than not that she can expect to achieve only a modicum of

financial improvement, itself likely five (5) years down the road.  The Debtor must continue with

her GED courses for a minium of four (4) more years, after which she will have the equivalent of

a high school diploma.  Even with a GED, in the twenty-first century labor market, I do not find

it likely that the Debtor's earning potential will increase to the point that she will be able to

absorb both the loss of the income derived from Kierah's SSI and a loan payment of

approximately $400.00 per month.

　　　　In this situation, I must decide this case based on the burden of proof.  Section 523(a)(8)

imposes the burden of proof on the Debtor to establish that it is more likely than not that her

situation will not improve.  Based on the existing record, I conclude that the Debtor has met her

burden on this issue by a preponderance of the evidence.   Based on the facts presented and the

reasonable inferences I draw from them, I find it more likely than not that the Debtor's financial

situation will persist for a significant portion of the repayment period of her student loans.

Accordingly, the Debtor has established the second element under Brunner.

### D.  Prong #3 of the Brunner Test

The third and final prong in the Brunner analysis requires the Debtor to establish that she made a good faith effort to repay her loans.  Faish, 72 F.3d at 305.  Under §523(a)(8), good faith is measured, in large part, by the debtor's efforts to obtain employment, maximize income, and minimize expenses.  E.g., Jones, 392 B.R. at 130.  Also, "[f]undamental to the good faith inquiry is the notion that the debtor did not willfully or negligently cause his own default, but that his condition results from factors beyond his control."  Id.; accord In re Coco, 335 F. App'x. 224, at 226-27 (3d Cir. 2009) (non-precedential).[20]  Good faith, in this context, is essentially an inquiry into whether the debtor has consciously or irresponsibly disregarded his or her repayment obligation – or, instead, whether there is some justification for the debtor's default and ongoing inability to repay the loan.  See In re Lehman, 226 B.R. 805, 808 (Bankr. D. Vt. 1998).

In large part, both Defendants suggest that the Debtor failed to make a good faith effort to repay the loans within the meaning of the third Brunner prong, because she made no voluntary payments.  Rather the only payments she made were the involuntary payments made on the Plus Loan through the garnishment of her wages.  Defendant ECMC further contends that the timing of the Debtor's bankruptcy case – a few months following the garnishment – is an additional indication of the Debtor's lack of good faith.  ECMC also contends that the Debtor's lack of good faith is evidenced by her "voluntary" choice to work only part-time.  ECMC suggests there

---

[20]         In another non-precedential decision, a panel of  the Third Circuit also described two non-exclusive factors that may be considered in the good faith determination: "(1) whether the debtor incurred substantial expenses beyond those required to pay for basic necessities and (2) whether the debtor made efforts to restructure his loan before filing his petition in bankruptcy."  Pelliccia v. U.S. Dept. of Educ., 67 F. App'x. 88, 91 (3d Cir. 2003) (non-precedential).

is some evidence in the record indicating that the Debtor is not making the effort she should to

earn more income; that she made a conscious, voluntary choice to stay home part-time and is,

essentially, hiding behind her daughter's medical condition.  Respectfully, I disagree with all of

these contentions.

I do not construe the Debtor's conduct in failing to make voluntary repayments indicative

of a lack of good faith.  As I noted in <u>Crawley</u>,

> Even if [the Debtor] made no payments, that fact would not necessarily establish a
> lack of good faith.  The failure to have made any repayments on a student loan is not a
> litmus test for good faith under the third prong of the <u>Brunner</u> test.  The good faith
> determination depends on the reasons why the Debtor did not make the payments.

460 B.R. at 447 n.36 (citation omitted).

In this case, given the Debtor's circumstances, the fact that she made no voluntary

payments is understandable.  Nothing in the record suggests that she was ever in the financial

position to do so while maintaining a minimal standard of living.  The picture painted at trial is a

single parent, working at a low-income job, while caring for a special needs child and attempting

to assist her other daughter in obtaining an education and the opportunity for a better life.   The

Debtor testified that as to the First Loan, she believed she was under no obligation to pay until

her daughter completed school.  I find this testimony credible.  I also credit her testimony that she

did not even understand that she was obligated on the Plus Loan and was unaware of the

obligation until her paycheck was garnished.  In this context, it is especially relevant in assessing

good faith that there is no evidence in the record regarding any notices, invoices, or

communication of any kind sent by either Defendant to the Debtor regarding repayment or any

type of program that might reduce her monthly payment.

Nor do I find the timing of the Debtor's bankruptcy filing suggestive of a lack of good faith warranting denial of her request for a discharge of the loans.  Even the modest garnishment of $53.29 per paycheck imposed a severe strain on her and her family, given the tight budget.  I perceive the Debtor's "rush" to the bankruptcy court shortly after the garnishment began as further evidence of the Debtor's dire financial stress, not as a tacit admission of some bad faith abuse of the student loan system.

And, finally, ECMC's argument regarding the Debtor's "choice" to work part-time simply put, does not carry the day.  I appreciate the point that, perhaps, Kierah's condition is not as "compelling" given the fact that (1) she no longer is taking medication and (2) has been "mainstreamed" in school.  But the truth of the matter is that the record in this case is sparse.  The Debtor was the only witness at the trial and while she was simultaneously optimistic and equivocal about Kierah's health and future prospects to live independently, she was quite clear that Kierah presently requires constant supervision, even at the age of 16.  And, while I can understand why ECMC's posits that Kierah (presumably with the Debtor's help) seems to be making strides toward independence, as factfinder, I decline to draw the suggested inference that the Debtor could have been working full-time, but voluntarily chose to work only part-time and make less money.  I consider it far more likely that the Debtor's decision to continue to work part-time is based on a good faith assessment of Kierah's needs.

For all these reasons, I do not construe the Debtor's conduct indicative of a lack of good faith warranting denial of her request for a discharge of the either student loan.

27

## V.  CONCLUSION

For the reasons set forth above, I conclude that the Debtor has established that her student loans are dischargeable under 11 U.S.C. §523(a)(8).  An appropriate order will be entered.

**Date: May 3, 2013**  _____
                        **ERIC L. FRANK**
                        **CHIEF U.S. BANKRUPTCY JUDGE**